IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALTAF J., <br><br> Claimant, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security, <br><br> Respondent. | No. 20 CV 6010 <br><br> Magistrate Judge Jeffrey T. Gilbert |

**MEMORANDUM OPINION AND ORDER**

Claimant Altaf J.[1] ("Claimant") seeks review of the final decision of Respondent Kilolo Kijakazi,[2] Acting Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 11]. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c), and the parties have filed cross-motions for summary judgment [ECF Nos. 23, 24] pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, Claimant's

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Acting Commissioner Kijakazi as the named defendant.

Motion for Summary Judgment [ECF No. 23] is denied and the Commissioner's Motion for Summary Judgement [ECF No. 24] is granted.

## PROCEDURAL HISTORY

On January 24, 2018, Claimant filed a Title II application for DIB alleging disability beginning on January 6, 2018. (R. 198–99). His claim was denied initially and upon reconsideration, after which he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 88–118, 135–36). On October 22, 2019, Claimant appeared and testified at a hearing before ALJ Cynthia Bretthauer. (R. 53–77). ALJ Bretthauer also heard testimony on that date from impartial medical expert ("ME") Dr. Allen W. Heinemann (R. 78–81) and impartial vocational expert ("VE") Kari Seaver. (R. 81–86). On November 20, 2019, ALJ Bretthauer denied Claimant's claim for DIB. (R. 16–28).

In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. §§ 404.1520(a), 416.920(a). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since January 6, 2018, his alleged onset date. (R. 18). At step two, the ALJ found Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c). (R. 18–19). Specifically, Claimant has generalized anxiety disorder, cannabis use disorder, gambling addiction, and alcohol use disorder, in remission. *Id.* The ALJ also acknowledged a non-severe impairment of strains of the cervical, thoracic, and lumbar spine, but concluded these strains did not result in any medically determinable impairment such as degenerative disc disease that would be expected

to pose more than minimal limitations on Claimant's ability to perform basic work activity for more than twelve months. (R. 18). The ALJ also acknowledged a non-severe impairment of hypertension and hyperlipidemia but noted Claimant had not experienced any symptoms as a result of these diagnoses, meaning they had not resulted in any functional limitations relating to Claimant's ability to perform basic work activity for at least twelve months. *Id.* Finally, the ALJ gave a nod to Claimant's history of diabetes mellitus without diabetic neuropathy but did not find this history rose to the level of a non-severe or severe impairment. (R. 19).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19–20). In particular, the ALJ considered listing 12.06 and evaluated whether the "paragraph B" or "paragraph C" criteria had been satisfied. (R. 19–20). In finding the "paragraph B" criteria had not been met, the ALJ discussed Claimant's limitations in certain broad areas of functioning, starting with no limitation in understanding, remembering, or applying information. (R. 19). In interacting with others, concentration, persistence, or pace, and adapting or managing oneself, the ALJ assessed moderate limitations. (R. 19–20). As to the "paragraph C" criteria, the ALJ concluded the medical evidence of record did not establish that Claimant has sought treatment on a consistent basis for two years, is likely to decompensate with changes to his environment, or would be expected to experience marginal adjustment. (R. 20).

The ALJ then found Claimant had the residual functional capacity ("RFC") to:

3

> "perform full range of work at all exertional levels, but with the following nonexertional limitations: can understand, remember, and carry out simple, repetitive and routine, one-to-three step instructions, with routine changes only, no multiple changes; tolerate occasional contact with the general public; should work primarily alone, having only occasional contact with coworkers and supervisors; and cannot tolerate fast-paced or high production quotas, but can meet end of day goals (R. 20).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a cab driver. (R. 26). The mental demands of this work – specifically, that it required more than occasional contact with the general public – exceeded Claimant's residual functional capacity, and so the ALJ concluded that Claimant would not be able to perform that past work as actually or generally performed. (R. 26). The ALJ then concluded at step five that, considering Claimant's age, education, past work experience, and residual functional capacity, he is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 27). Specifically, the VE's testimony, on which the ALJ relied, identified jobs at the light exertional level, including machine feeder, sweeper/cleaner, and production/helper. *Id*. The ALJ then found Claimant was not under a disability from the disability onset date of January 6, 2018 through November 20, 2019, the date of her decision. (R. 27–28). The Appeals Council declined to review the matter on August 11, 2020, (R. 1–7), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill*, 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

When a claimant files an application for disability benefits, he or she bears the burden under the Social Security Act of bringing forth evidence that proves his or her

4

impairments are so severe that they prevent the performance of any substantial gainful activity. 42 U.S.C. § 423(d)(5)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 147–48 (1987) (citing 42 U.S.C. § 423(d)(1)(A)). A five-step inquiry controls whether an individual is eligible for disability benefits under the Social Security Act, which the Seventh Circuit has summarized as follows:

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."

*Butler v. Kijakazi,* 4 F.4th 498, 501 (7th Cir. 2021) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); 20 C.F.R. §§ 404.1520, 416.920). Claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021); *Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022).

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate

5

to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also,* 42 U.S.C. § 405(g); *Fowlkes v. Kijakazi*, 2021 WL 5191346, at *2 (7th Cir. 2021). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. But even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not build a "logical bridge" from the evidence to the conclusion. *Wilder,* 22 F.4th 644 (citing *Butler,* 4 F.4th at 501); *Jarnutowski v. Kijakazi,* 2022 WL 4126293 (7th Cir. 2022). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *see also, Gribben v. Kijakazi,* 2022 WL 59404, at *2 (7th Cir. 2022) ("We do not reweigh the evidence or resolve conflicts in it."). "[O]nly if the record compels a contrary result" will the court reverse the ALJ's decision. *Fowlkes*, 2021 WL 5191346, at *2 (quoting *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010)).

6

## ANALYSIS

### I. The Medical Opinion Evidence

Claimant's first argument, although titled as a challenge to the ALJ's RFC determination, in fact contests how the Commissioner treated two pieces of medical evidence. First, Claimant contends that the ALJ gave short shrift to the state agency consultants' opinions that Claimant had moderate limitations on both his ability to maintain concentration and attention for extended periods and his ability to complete a normal workday or workweek or perform at a consistent pace without and unreasonable number and length of rest periods. [ECF No. 23] at 12–13. Second, Claimant takes issue with the Appeals Council's determination that Dr. Mark Amdur's January 13, 2020 psychiatric evaluation did not relate to the period at issue, which ended on November 20, 2019. [ECF No. 23] at 13. The Commissioner did not err in either respect, as explained below.

#### a. State Agency Consultants

Two state agency consultants evaluated Claimant in this case: Dr. Janet Anguas-Keiter at the initial level (R. 89–100) and Dr. Kevin Ragsdale at the reconsideration stage (R. 103–18). The ALJ found their opinions "somewhat persuasive," and specifically credited their findings that Claimant's "impairments have resulted in moderate limitations in the paragraph B criteria." (R. 26). But because neither consultant "clearly or articulately defined a residual functional capacity," the ALJ found the testimony of Dr. Heinemann, an independent medical expert who testified at the hearing, more persuasive on the ultimate issue of what type of work Claimant could perform on a sustained basis. (R. 26) ("I have considered

7

the state agency consultant assessments in making these findings, and I find they are somewhat persuasive to the extent that the claimant's impairments have resulted in moderate limitations in the paragraph B criteria, but I note that the state agency consultants did not clearly or articulately define a residual functional capacity. Therefore, while the findings set forth in the state agency assessment are somewhat persuasive, the evidence received at the hearing including Dr. Heinemann's testimony is the most persuasive reflection of the claimant's ability to perform basic work activity.") (internal citations omitted).

Both consultants evaluated Claimant's medical history and opined that Claimant had certain functional limitations. (R. 96–98, 133–15). For Dr. Anguas-Keiter's part, she noted that Claimant was moderately limited in only two areas: his ability to maintain attention and concentration for extended periods, and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 98). When asked to elaborate in "narrative form" on Claimant's sustained concentration and persistence capacities, i.e. provide an explanation for what type of work Claimant could or could not perform given the limitations she identified, Dr. Anguas-Keiter responded, largely unhelpfully, with the following six words: "recent, long term, and complex work." (R. 98). Overall, Dr. Anguas-Keiter concluded Claimant is "capable of completing [simple, routine tasks] and some more complex tasks, per ADLs, PRW, and MER." (R. 98).

Dr. Ragsdale, in turn, noted that Claimant had moderate limitations in a number of categories, including understanding and memory, concentration and

8

persistence, social interaction, and adaptation. (R. 113–15). He elaborated significantly more than Dr. Anguas-Keiter regarding how those limitations could be accommodated, noting that in the category of understanding and memory, Claimant would "probably struggle if he had to master a set of academically/technologically-sophisticated vocational operations/processes quickly. However, he remains cognitively capable of comprehending basic instructions and becoming proficient with straightforward job procedures." (R. 113). Relating to Claimant's concentration and persistence capacities, Dr. Ragsdale concluded that Claimant "may have trouble remaining optimally focused and consistently displaying exemplary persistence; these difficulties would likely be most noticeable in fast-paced, detail-intensive jobs and positions requiring him to "team up" with others on a regular basis. Nevertheless, with the benefit of conventional breaks, [Claimant] would be able to be sufficiently attentive and effective over the course of a normal work day while completing simple job tasks with nominal demands." (R. 114).

On social limitations, Dr. Ragsdale explained that Claimant "has the ability to communicate appropriately about specific aspects of a task-oriented work process, and he would be expected to be able to conform his behavior to the social conscriptions that are typically predominant in most vocational environments. However, in his current mental state, he is at increased risk for reacting ineffectively (emotionally and/or behaviorally) at times to the pressure of performing job tasks accurately in the presence of others (e.g. customers/coworkers) and the stress of receiving supervisory input regarding his job performance." (R. 115). Finally, as to Claimant' adaption limitations, Dr. Ragsdale described that Claimant "may react negatively to sudden

9

changes in the work process-especially those perceived as resulting in more time/effort. That said, he could adjust to routine modifications in vocational duties; adhere to occupational safety regulations; secure transportation to a jobsite; and demonstrate an acceptable level of independence in general work-related activities." (R. 115). On balance, like Dr. Anguas-Keiter, Dr. Ragsdale concluded that Claimant has "the capacity to perform basic work activity." (R. 115).

The ALJ did not err in her reasoned decision to find the above-described assessments only somewhat persuasive. She in fact credited both consultants' determinations that Claimant has moderate limitations in the paragraph B criteria, and fulsomely explained in her opinion why she agreed those moderate limitations should be assessed. (R. 25–26). She then went on to carefully explain how certain accommodations in the RFC were tailored to the different categories in which she assessed moderate limitations. (R. 25–26). For example, regarding Claimant's ability to concentrate, persist, or maintain pace, the ALJ examined the objective medical evidence, Claimant's activities of daily living, consultative examination findings, and Claimant's course of treatment before concluding that Claimant had moderate limitations that could be directly targeted by a restriction to simple, repetitive, and routine one-to-three step instructions without any fast-paced or high production quotas and only end of day goals. (R. 25–26). The ALJ's explanation more than accounted for the consultants' assessment of Claimant's functional limitations.

In the same vein, Claimant's quarrel with the ALJ's conclusion that the consultants "did not clearly or articulately define a residual functional capacity" is not persuasive, because, simply put, the ALJ is right. Neither consultant provided a

clear view of what type of work Claimant could perform, except that a restriction to simple, routine tasks, (R. 98), or "basic work activity," (R. 115), would be acceptable. As the Court outlined above, the ALJ accommodated the substance of the consultants' evaluations in her own assessment of Claimant's functional limitations and was correct to rely more heavily on Dr. Heinemann's testimony regarding what type of work Claimant could perform on a sustained basis given his limitations, rather than focus on what general scenarios he may or may not struggle with (as the consultative examiners did). (R. 26, 96–98, 133–15). The ALJ minimally articulated her justification for partially rejecting the consultants' comments regarding Claimant's residual functional capacity, and that is enough. *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004).

### b. The Appeals Council and Dr. Mark Amdur's 2020 Psychiatric Evaluation

Claimant next cursorily argues that the Appeals Council erred in its conclusion that Dr. Mark Amdur's January 13, 2020 psychiatric evaluation did not constitute evidence that was "new, material, and relate[d] to the period on or before the date of the hearing decision." 20 C.F.R. § 404.970(a)(5). In raising this issue, however, Claimant does no more than summarize Dr. Amdur's opinion and conclude, in a single sentence, that "[t]he Appeals Council's finding that Dr. Amdur's report from January 2020 did not relate back to at least October 2019 (R. 2), is simply wrong." [ECF No. 23] at 13–14. Claimant does not illuminate the how or why of the Appeals Council's asserted error, leaving this Court to guess how the Appeals Councils' decision not to consider a report that almost exclusively recounts Claimant's subjective symptoms,

11

provides minimal objective analysis, and post-dates the relevant period constitutes error. This perfunctory and undeveloped argument is waived. *Schaefer v. Universal Scaffolding & Equip.*, LLC, 839 F.3d 599, 607 (7th Cir. 2016). "It is not this court's responsibility to research and construct the parties' arguments," and Claimant has not done enough here to allow the Court meaningful review of this issue. *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011).

## II. Step Five

Claimant next asserts that the ALJ erred in her step five conclusion that a significant number of jobs exist in the economy that Claimant can perform. At step five, the burden shifts from the claimant to the ALJ to demonstrate that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations. See 20 C.F.R. § 416.960(c)(2). One job, existing in "significant numbers" in the national economy, is enough. See 20 C.F.R. § 404.1566 ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications") (emphasis added); *Collins v. Berryhill*, 743 F. App'x 21, 25–26 (7th Cir. 2018) (55,000 jobs was a significant number of jobs nationally); *Mitchell v. Kijakazi,* 2021 WL 3086194, at *3 (7th Cir. 2021) (30,000 jobs was a significant number nationally); *Iversen v. Berryhill,* 2017 WL 1848478, at *5 (N.D. Ill. 2017) (30,000 jobs in the national economy was significant); *Joseph M. v. Saul,* 2019 WL 6918281, at *17 (N.D. Ill. 2019) ("positions account[ing] for 40,000 jobs nationally" qualified as a significant number); *Dorothy B.*

12

*v. Berryhill,* 2019 WL 2325998, at *6–7 (N.D. Ill. 2019) (17,700 jobs is a significant number of jobs in the national economy).

Here, the ALJ identified – relying on the VE's testimony – 80,000 jobs in the national economy that someone with Claimant's limitations could perform. (R. 27) (machine feeder: 50,000 jobs, sweeper/cleaner: 20,000 jobs, production/helper: 10,000 jobs). This is a significant number, in this Court's view. The Seventh Circuit agreed when it commented in *Mitchell* and *Collins* that 30,000 jobs and 55,000 jobs in the national economy was significant, although there remains no controlling precedent in this Circuit as to the precise threshold for a "significant number" of jobs in the national economy. "[D]istrict courts within the circuit—applying national numbers— have found as many as 120,350 jobs to not meet the burden, and as few as 17,700 jobs to be significant." *Angela L.,* 2021 WL 2843207, at *5 (citing *John C.,* 2021 WL 794780, at *5). The Third, Sixth, and Eighth Circuits have all found that fewer than 28,000 jobs is a significant number of jobs in the national economy. *Sanchez v. Comm'r of Soc. Sec.,* 705 F. App'x 95, 99 (3d Cir. 2017) (finding 18,000 jobs in the national economy significant); *Taskila v. Comm'r of Soc. Sec.,* 819 F.3d 902, 905 (6th Cir. 2016) (finding 6,000 jobs in the national economy significant); *Gutierrez v. Comm'r of Soc. Sec.,* 740 F.3d 519, 528-29 (9th Cir. 2014) (finding 25,000 jobs in the national economy significant); *Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir. 1997) (finding 10,000 jobs in the national economy significant). The Court agrees with the majority view articulated above and rejects the minority position proposed by Claimant and supported by a single citation to a non-precedential case from another district. [ECF No. 23] at 14–15 (citing *Sally S. v. Berryhill,* 2019 WL 3335033 (N.D.

13

Ind. 2019)); *see also, Marko L. v. Saul,* 2021 WL 843427, at *6 (N.D. Ill.2021) (criticizing *Sally S.* as an outlier on the issue of what constitutes a "significant number of jobs" given recent Seventh Circuit precedent).

## CONCLUSION

Accordingly, for all these reasons, Claimant's Motion for Summary Judgment [ECF No. 23] is denied and the Commissioner's Motion for Summary Judgment [ECF No. 24] is granted. It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   September 28, 2022